Morning, Your Honor. My name is Jerry Steering. I'm a lawyer in Orange County. Can you speak up a bit? My name is Jerry Steering. I'm a lawyer in Orange County. I've been doing these police misconduct cases for about 33 years and this is the first case that I can say that I've actually seen what appeared to be a I think the ultimate issue in the case is whether or not the police have a right to execute someone for any reason. The plaintiff doesn't dispute that the first nine shots that were shot by Deputy Higgins did not run afoul of the defendant's proscription against an unreasonable seizure. Nobody's disputing that. We have a 21 year old young man who had a seizure and went crazy and had a dream the night before that the that he was going to get shot to death by police the night before. The morning of the shooting his roommate was so concerned about his the mental state of the young man because he was repeatedly having seizures that he called the decedent's mom, the plaintiff, in Seattle at about 10 a.m. in the morning and she was at the house in Orange County at by 6 p.m. that the young man did run out. He was in his jammies with a jacket on, kind of a red jammies with a black jacket. He did run up to Officer Lopez. He did stab Officer Lopez and I think he caught him off guard but Officer Lopez was getting out of his car. So nobody's gonna, we're not gonna dispute that Michael Higgins was justified in shooting Connor Zion for the first nine shots. But there is a reason that we don't have summary executions by police in this country. Well you're saying summary executions but this was a very short period of time was it not? Very short. How do you not connect the two, they've been called two but given that there's only a second or even fractions of a second between these two volleys and it was all a response to the same situation, I mean is it unreasonable to treat them as a single event? I don't believe so. The reason I say it is this, that this is one of the few cases where we actually have a recording from Deputy Lopez's car showing the young man running out with a knife saying you know you this and the dirty words and all that and then we have the video from the other car showing the shooting of the young man by Deputy Higgins and the young man after he stabbed the officer and the officer didn't stab him in the trunk or the neck or the head but he got stabbed in his arms and it's very serious and a very bad thing. I'm sure it terrified both of But when the young man runs in front of the car, that's when Deputy Higgins, at least the car but the video that we can see, that's when Deputy Higgins starts shooting and you can count them off. Those are the shots that appear to be off where you don't see the shooter? That's correct, your honor. I'm just trying to identify them on the video. So there's a series of shots that happen off-camera. You can hear the shots, you can see the flash but you can't see the shooter? Yes, your honor. Okay and I couldn't tell from the video, did Connor fall at that point? It's hard. What happened was as Connor was running in front of I think it's Deputy Higgins, the shooter, off screen, off to the right, back to the right. You can see the young man run in front of the car and as he's running, Deputy Higgins, you hear the shots. You don't see the holes in the black jacket in the nighttime but you hear the shots and there's nine shots and at the end of nine shots, by that time, Connor Zion had reached the sidewalk from the parking lot area and he fell down on the sidewalk and he fell down on his back and Deputy Higgins was running after him and when Deputy Higgins got to Connor Zion's feet and Connor Zion is basically on his back with his head away from Deputy Higgins and his head facing toward Deputy Higgins, Deputy Higgins decides to stand over him, a man who's just been shot nine times. We don't know whether he's been shot nine times. We know he's been shot at nine times. Yes, Your Honor. You ever shot a handgun? Yes, Your Honor, I have. They're hard to aim. Well, they're not that hard to aim from about eight feet away and they have these, they have a... I mean, you can't tell where the shooter is so it's because it's off camera and I'm sure there's evidence on this, but you know, while you're running and so, so you can't be sure that you've hit nine times when you pull the trigger, but, but Connor does go down as a result of that first series of rallies. Nine shots, he's down on the sidewalk, he's on his back. What's wrong with yes? What's wrong with yes? Is that right? Yes. Huh? Yes. Yes. No. Okay, so, so he goes down. Can we tell from the video or is there evidence on whether he's moving? I mean, people can go down and yet still be quite dangerous. Well, you know, if he's hit in the leg or the hip or the kneecap, you know, he will go down, but he's holding a knife. He's not holding a knife when he's down? I don't know. Well, we don't. He was holding a knife at some point. How do you know? Because the, the, the body just stayed there and we had, there's photographs of the knife in the, in the little garden area a few feet away from the body. Well, but again, this is sort of, we now have all these perspectives that the officer doesn't have. What he knows is this guy with a from the video, I couldn't tell whether he still had the knife or not or whether he was still moving or anything like that. I mean, you, you, I mean, I think your argument was, oh, this guy's been shot nine times. There's no reason to shoot him again because, you know, nine shots should have taken care of him. But how do we know nine shots hit or that any of the, any of the hits were incapacitating? Higgins says he's pretty good shot and they have to train every month. They're using Glock 40s or Glock 45s, semi-automatic pistol. He's fairly accurate. He's fairly close. Part of the training is also you make sure that, you know, keep pulling that trigger until you make sure that guys can't keep coming at you. That's part of the training too, isn't it? I'm not, I'm not, I'm just, I'm just telling you what the facts are, what the facts are. If he's on his feet. I'm sorry? If he's on his feet. You know, it reminds me of the scene in the movie Full Metal Jacket, where the GIs finally get into this warehouse and find this Vietnamese girl that they just shot up lying on the floor. And she's saying to the men, shoot me, shoot me. Now she's moving her head around. She's moving her head, but she's clearly incapacitated. If you're going to have dueling movies, why not Pulp Fiction, where the guy takes all those shots and misses, you know? So, you know, it's a, you know, if you want to use movies, you know, we can come up with a lot of examples. Your Honor, it's something people can relate to. You better not get into a fight about movies with your assistants. Anyway, here's what I'm trying to get to. The man standing over somebody who shot at nine times. He was pretty close. He's a pretty good shot. He admits that. What is your view? What should he have done in the circumstances? Sorry. No, no. Pause. He wasn't in a hurry to get back to his fellow officer. Well, why do you say that? The fellow officer was wounded, seriously. It appeared that he was in a hurry to get back. Well, here's the problem. After all the shots were fired, the full 18, there was a 10-second delay. And all that Deputy Higgins would do is walk around in circles for 10 seconds. Because I could just see him, like, wow, what just happened? What did I do? He's calls in the shooting on his radio. And then he goes back to Connor's eye on and stomps him in the head three times. But it wasn't stomp, stomp, stomp. It was stomp, walk around some more, stomp, walk around some more, and stomp. That was 17 seconds between the first stomp and the last stomp. Now, you know, it's one, maybe, maybe he couldn't tell. But he could see whether or not there's a knife in his hand. He's lying on his back. Deputy Higgins claimed in his testimony, in his deposition, and this is in the separate statement in opposition to the motion for summary judgment, he claimed that when he shot Connor Zion after the first nine shots, he said 10 or 11, but we counted it was nine, that Connor Zion tried to push off the ground with his hands to get up. And that's why he shot the second volley. That was his claim. That's why he shot the second volley. And people can look at things differently. And people can feel that something's reasonable and some other person is going to feel it's not reasonable. But in the end, if it's if reasonability is something that's up for grabs, it's something that's not fixed by adherence, by application of the facts to a strict legal doctrine. If it's not fixed, it should go to a jury. We've been every day I turn on the radio, I hear somebody else get shot. Before Plumhoff, the case cited in this brief, before Plumhoff in 2014, the CHP policy on pursuits was follow the guy until he ran out of gas. Then Plumhoff comes and you have the San Bernardino County Sheriff's Department sniping guys out of a helicopter for going the wrong way in the 215, who ended up killing a bunch of people when his car crashed. All I'm trying to say is we're getting away from ourselves. It's like you see a relative who's at five years old, you don't see them until they're 20. And when you see them at their 20, gosh, they look different. They're different. But the parents who were with them every day didn't notice the difference. So what I'm suggesting is we're getting to the point where we're the parents. We're not seeing that change. You know, I've lost the analogy completely. The metaphor is lost. I think you better save the rest of your time for rebuttal. All right. All right. Your Honor. Who are the parents? I don't get it. The kicking on the head. Take Judge Reinhardt's advice. Sit down and let's hear from the other side. Thank you. Good morning, Your Honors. May it please the Court. Lon McIntyre on behalf of the Defendant Appalese County of Orange and Officer Michael Higgins. Why don't we work backwards from the stomping? How do you justify that? I mean, first nine shots, okay, you know, he's moving. He does go down, all right?  One of those bullets connected. But then you can see him standing over the body and just, you know, it's very hard to miss in that case. How do you justify at that point going around stomping on his head three times? The head strikes are justified by looking at the totality of the circumstances that were going on at the time of this event. And we have the Graham factors, which are all... I'm sorry. Were there other assailants? I mean, was he afraid that somebody else was going to come out and help this guy? No. There was nothing like that. So what would the... I mean, just saying totality of the circumstances doesn't help much. I mean, the guy's on the ground. We know he's been hit at least once to make him go down. And then the officer stands over him at the distance that... I don't know, from the looks of it, I'm not very good at distances, but I would say no more than three feet from the muzzle to the target. Three feet, four feet, I would say. And he shoots nine times. Now, even I can't miss it. You know, I'm a very bad shot. I think it'd be very... What risk is there to the officer that justifies then... To me, it looks to me like the kind of thing the jury might look at and say he was just angry, and he was overcome by bloodlust, by revenge, and decided he's going to kick him in the head. Why isn't that a plausible interpretation of what happened? None of which would be justified, right? Right. Well, I think it's not plausible for a number of reasons. First of all, there is... Why don't you give me one good one? Evidence... The video shows continued movement by Mr. Zion on the ground. The evidence shows the officer now has an empty gun. The officer now has an empty gun. He's emptied all 18 rounds from his gun. There are other people around that need protection. One of the officer's jobs is not only to protect his own safety, but that of others. There's a woman walking the dog. They're in front of a residence. He doesn't know how many people are going to come out. It's evening. There's Officer Lopez, who's still there. So the risk is that this guy, who's been hit at least once, goes down, and then has been the subject of this volley at close range, is going to get up and attack somebody else, so he has... There is that risk. There is an ongoing risk at that point in time. And again, this happened so quickly under circumstances that were so extreme... It wasn't that quick. The head stomping, there was a delay, and then there was one stomp, and another stomp, and another stomp. Yes, and aside from the video... You don't think that there has to be something that suggests that he's actually getting up? I mean, the fact that he's still twitching or moving, you think is enough to justify that? I do, Your Honor, because we're not judging whether the movement was what it meant. The fact is that he was still moving, and that officer gets... Why is that the case? I mean, if it doesn't mean... If the movement doesn't mean I'm going to get up and hurt somebody, unless you can interpret the movement that way, does a movement have... I mean, if he's just sitting there twitching, is that kind of movement enough? Well, it isn't unreasonable for this officer to believe that any movement was threatening, and that he had the right to extinguish the threat under the law, because... Counsel, do you agree with what the opposing counsel said, that the knife was no longer in his possession, and that it had been found in the flowerbed? Do you agree with that? Well, I believe there's evidence that it was found in the flowerbed, but the officer didn't know that at the time, and it's not here from the video. And I mean, isn't that the issue here, in terms of the reasonableness of what you call the head strikes here? I mean, when you view the video, it did appear that there was time for the officer to make the decision to strike or stomp on this person's head. Wouldn't it have been more reasonable to make sure he was disarmed or handcuffed? Why was it necessary to render him unconscious with force to the head? Well, because under these circumstances, we have a person who's obviously crazy. I mean, he immediately rushes... Obviously shot as well, and obviously on the ground. The officer doesn't know how many times he was shot at that point in time. I know we can look at it in hindsight and figure things out, but at that point in time, he doesn't know how many times this person's been hit. He knows that he's crazy. I'm sure this officer has experienced other persons on drugs or experiencing other disturbances that show extraordinary resilience and are able to get up after what you would think would surely be a fatal strike to that person. And he also knows, he's been trained, that he is supposed to render the threat of immediate harm to extinguish it. And he has the right to do that and to use force to do that. And I think that it is unfair to say that we can parse out each of these sections of this very rapidly evolving sequence of events and from the officer's point of view, make a determination that any of it was unreasonable. And again, Blanford and the other cases that talk about, you have to look at the totality of the circumstances from the beginning, even if you are slicing and parsing out different sections. And this is not a case where there's a lengthy period of time that expired between the initial attack and the initial shooting and his desire, and it was, there's no dispute that the officer stated it was intent to render him unconscious. There's also an autopsy report that says that the strikes to the head did not cause significant harm. So it's unfair to start with the premise that he was stomping him to death. That was not what the autopsy report reflects. Didn't cause significant harm because he was already dead? No, it didn't cause significant injury to his skull. So we have that in the record. It's at ER 212, where our police expert says that he noted that as part of his conclusion that any reasonable officer would have used the force that he had used in this case, that it was a reasonable use of force. And this is, again, it's always on a spectrum and we have to look at it in a way that is not from hindsight, but from the point of view of an officer who has to make an exigent, snap judgment under very, in this case, obviously extreme circumstances. Well, let's move back to the second volley, moving backwards. The guy's down, right? And before he can cause anybody any harm, he has to get up. I mean, he can't harm anybody lying there on the ground. Why is the Office of Justifying and Shooting without seeing him get up? I mean, he still has, I guess it was, there were 18 bullets in the magazine. He shot nine. We know he didn't shoot them all because he would have known that. So he has a significant number of bullets still in his weapon. He's at close range. Why isn't the appropriate thing to do in those circumstances to step back and see if the guy's getting up? If he gets up, then shoot him. But you can also use verbal commands. Say, stay on the ground. Don't get up. See if you're... Why isn't that the appropriate response? Well, I think that's the application of hindsight, which is what the law says we're not allowed to do. And I think we have to look at the time, at the moment. And my interpretation of the video was that there were nine shots fired. I'm asking at the moment. The guy's on the ground. He's just been the subject of a volley, which resulted in going down. So at that point, you've got this situation. You've got a guy that you know has been shot in a way that causes him to fall. Okay. Why isn't the situation, you know, if you sort of look at that incident in time, say, well, is he at that point a threat to anybody? That the kind of threat that would justify the use of lethal force? Because the next bullet that you... The next trigger pull is lethal force. So if he's on the ground, he's not making any movement to get up. Why is that the kind of situation where he is... That justifies the use of lethal force? Well, first, I would quibble a little bit with the scenario that you've presented and as part of your question. And that is my interpretation of the video is that there were nine shots and he continued to run after those nine shots had been fired. And the officer's testimony is that... I'm sorry, he being... Mr. Zion moved rapidly away from Officer Lopez after the nine shots were fired towards the sidewalk, towards the entrance of the residences. And Mr. Higgins testified he did not know how many of those shots actually hit him. And we don't know, did they hit him in the hand? Did they hit him in the foot? He doesn't know. But he's on the ground. But he has fallen and we don't even know if he's fallen because of being... The gunshots. We don't know that. He's on the ground. And if he makes movements to get up, he can be shot again. The question is, why is it okay to shoot him while he's still on the ground? I mean, how does the guy surrender? I mean, let's say, in fact, he hadn't been shot. He just wants to, you know, get on the ground and say, I give up, don't shoot me. How does that happen? Why is a guy that's on the ground and there's no indication at all that he's getting up? But it doesn't take very long to pull a trigger. You see the guy getting up on his hands and knees, you shoot him a few more times. But why is it okay to shoot him again, pull that trigger again while he's flat on the ground? It's okay because the law says that you have a right to extinguish a threat. And if a person is still moving, even if on the ground. Well, that begs the question. Why isn't that threat extinguished once the guy is on the ground? I mean, frequently the police say, lie down on the ground. That's the command police give to show surrender and to get people ready, suspects ready to be arrested, you know, lie on the ground. And then they come and they put handcuffs. Under these rapidly evolving circumstances where you have an actual stabbing of a person in front of your very eyes, and you have a very short period of time between when the whole incident started and when that person is on the ground. It is completely reasonable and within the law for this officer to believe that he has a right to extinguish the threat. And there is a threat. Say you, but that's really the very question we're looking at. Why, once he's on the ground, once he is on the ground and has to get up, he can't hurt anybody while on the ground. Why doesn't the officer, why isn't the officer required to wait for him to try to get up before he starts shooting again? Because he was, he was moving. The officer doesn't know how many times he's been shot or how harmfully he's been shot. He knows that he had a knife and could well have still had the knife. Well, that would be easy to see whether he had the knife. I mean, that would take two seconds to look and see whether the knife was still in his hand. Well, not necessarily, depending on where the knife may have been hidden and where it was placed. But more importantly, what we have is a reasonable range of conduct that is allowed by the law. And we're, we're, we're here in a situation where what you're requiring is an officer, if this were the law, that he had to stop at every shot. Did he have to stop at the 10th shot, the 11th shot? If he has to stop and pause at every shot. That's sort of a parody. No, I mean, once he hits the ground, I mean, if he pulls in and he pulls the trigger in rapid succession, and at the end of that series of volleys, the suspect is on the ground. And why isn't that a stopping point? He says, okay, now he's on the ground where I want him to be. And why doesn't there have to be some movement to get up before the officer is justified in shooting again? I think continued movement under these circumstances is enough for this officer to be, feel justified, to be justified. Now, I didn't see continued movement on the video. What does the officer say about continued movement? Well, he, he stated that he continued to move and it appeared that he was trying to get up on his knees. So he viewed that as a threatening conduct. And the video does show continued movement. Now, they want to speculate... The video doesn't show that he's getting up on his hands and knees to see officers testified. I think, I think the officer's testimony is not very helpful to you. If anything, it creates a factual issue because the video might suggest to people who saw it that that statement's not true, that he was getting up on his hands and knees. Well, I, I agree that the video may differ from his testimony, but his testimony is helpful in the sense that it does provide his state of mind at the time. Well, if it's true, if it, if that was his state of mind, or if that testimony is designed to exculpate him falsely. I'm not suggesting it is. I'm saying that is a factual question for a jury to decide. Did he really imagine that he was getting, that this man was getting up on his hands and knees because he was frightened? Or is he making it up? That's clearly a jury question. Not in this case, because really the only disputed factual issue created in the summary judgment motion was, or evidence to support the existence of one, was the video of this incident. So under these circumstances... That's more than we usually have. This is true, Your Honor. And under these... There's nothing on the video suggesting that he's getting up. I, um... Jury could look at that and say the guy's not getting up. Okay, let's, it's, and assuming that that's what a conclusion was... There's other officers saying, I thought he was getting up. You've got a video that they could see, uh, uh, you know, could, the way I saw it, he wasn't getting up. But, you know, maybe, maybe you could interpret it differently. But certainly reasonable people could look at that and say the guy's on the ground. It's not, it doesn't look like he's getting up. So you've got a... Why isn't that a factual dispute? Because even so, under all of the circumstances in this case, and considering the totality of the circumstances, which we must consider as part of the officer's, a reasonable officer's understanding of the circumstances, not in hindsight, the movement, his continued movement was a threat and he had the right to extinguish the threat before he could help. You've been over this now about five times, but, uh, your time is over. Thank you so much. Thank you very much. Usually when I hear the word totality of the circumstances, it's a, another way of saying, let's not bring facts in this argument. It, it, it, it may be applicable when there are so many variables that go into some kind of formulation or determination that you can't pick one out. But I think this is a pretty distinct incident. And I think that Judge Selna, um, used the wrong standard and made judgments about the the, uh, with regard to the second volley, Judge Selna says the record, this proves that the threat was completely over or that the suspect had clearly, had been clearly incapacitated when Higgins resumed shooting. As far as the, um, the stomp on the head, uh, just, uh, Judge Selna says within the upon observation that the dangerous suspect was not in fact motionless, was reasonable to protect himself, his fellow officers and the public. And I just don't see any of that. Okay. From the video. Thank you. That case just argued will be submitted. The court will take a brief, uh, recess.
judges: Reinhardt, Kozinski, Berg